Littleton, Judge,
dissenting:
Upon further study of the contracts in these cases and the entire records, I am of opinion that judgment should be entered for the plaintiff in each of these cases for the following reasons:
(1) I think the actions of the ordnance claims board were not conclusive and binding upon the plaintiff and that the time and manner in which it submitted its claims for profit on unused material to the department in May, 1924, do not preclude it from obtaining judgments in these suits on such claims. Throughout the period of these contracts and for some time after completion or cancellation (contract No. 14064 of July 12, 1917, involved in case D-844 being the only contract completed), plaintiff’s bills and charges were prepared and submitted to the cost-accounting organization of the War Department, and this practice continued until the chief of the cost-accounting office under these contracts advised the plaintiff that bills and statements submitted to the ordnance office of the War Department could not be passed for payment until they had been considered by the-ordnance claims board, which had been set up after the contracts were canceled. These ordnance claims boards were not provided for in the contracts and the plaintiff at no time agreed to be bound by any determination made by them. These boards were provided by the department after the-armistice for its own aid and assistance-, and they func *736 .tioned to a very large extent in the settlement of Dent Act ■cases. In submitting its bills and statements to such ordnance claims board by direction of the chief cost accountant, plaintiff did so upon specific instructions from defendant’s general accountant in charge of the audit, approval, and payment of claims made under these contracts. In doing ■this the plaintiff followed the procedure outlined to it by the chief cost accountant; however, it expressly reserved “ to itself in this procedure all its rights of procedure under its .said contracts and is in this appeal conforming to the rule .laid down by the department as it understands them.” Each of these cost-plus contracts defined “ costs ” and provided for the appointment by the contracting officer of a “ compensation board ” to ascertain, estimate, and determine such costs in accordance with the contracts. Such a compensation board was appointed, and, so far as appears, was never dissolved. These contracts also expressly provided that they might be canceled by the contracting officer, but that in the case of such cancellation the contractor should receive full reimbursement on account of expenditures theretofore made ■or liabilities incurred up to the date of cancellation to make up “ the actual cost ” as defined in the contract, and that to such “ actual cost,” including the cost of material purchased, ■acquired, or furnished by either party for the purpose of the contracts, there “ shall be added ten per cent for profit.” .Following this provision for cancellation each contract provided that any doubt or dispute as to the meaning of anything in the contract should be decided by the Chief of Ordnance. The Chief of Ordnance never made any decision on any of the questions involved in these cases.
Office order No. 489 of December 24, 1918, by the Chief of Ordnance, designating the members of the claims board as a ■compensation board under “ certain small arms and small arms ammunition contracts ” was not brought to the attention of plaintiff until about ten years thereafter when evidence was being taken in these cases in this court. Furthermore, this office order did not specify the contracts of the plaintiff. Moreover, office order No. 687 of May 23, 1919, by the then Chief of Ordnance, specified and laid down the *737 •detailed rules to be followed and tbe authority of the claims hoards in -connection with the settlement of completed, suspended, or canceled, and cost-plus contracts, and also provided that the actions of the claims boards, to be effective, should be approved by the Chief of Ordnance. The actions -of the claims boards in these cases were not approved by the ■Chief 'of Ordnance. The last-mentioned office order, No. 687, was not brought to the attention of the plaintiff until almost ten years after it was issued. Neither office order 489 nor 687 contained any provision that a determination by the vordnance -claims board should be final and conclusive, and, even if either order had so provided, I do not think the ^plaintiff would have been bound because such orders were :not brought to plaintiff’s attention and such procedure was .a departure from the terms of the contract and the plaintiff ■did not agree thereto.
The joint audit of the Government and the plaintiff of the unused materials on hand when the contracts were canceled was not completed until some time in 1921 and payments in respect to materials were being made by the Government as late as June, 1921. There was of necessity a great deal of work to be done by the plaintiff’s officers and employees and the Government’s employees in connection with the great number of matters involved under these contracts. When the plaintiff in May, 1924, submitted its claims for profit on unused materials on hand applicable to the canceled contracts, such claims were prepared in accordance with and were supported by the audit which had been made by the department, which audit was specifically referred to in these claims and made the basis thereof. These claims •were never considered or rejected on their merits but were disallowed without prejudice because the appropriation of the War Department for the payment of such claims had reverted to the Treasury. The delay, if it may be so termed, until 1924 in filing claim for profit on unworked material was not unreasonable in the circumstances of these cases. Plaintiff and the Government were constantly engaged from the date of cancellation of these contracts in making audits •and checking various matters, and in preparing and considering bills, statements, and claims which the plaintiff was *738 prosecuting, and the Government was investigating and considering. The situation of the parties was not merely that plaintiff had two claims to present, one for depreciation of value and one for unworked material. The record discloses that payments on account of ordinary depreciation arising prior to 1918 were being made late in 1920 and a great many other items of account, about which there never was and could be no real, controversy, were being audited, adjusted, determined, and paid over a period of more than three years after the contracts were canceled. Plaintiff had six years from the date of cancellation within which to present and prosecute .its claims on any items arising under these contracts before the department and this court, and the allowance of a timely claim if meritorious should not be denied because it was not presented immediately or very soon after the cause of action arose.
(2) I think these contracts contemplated payment to the plaintiff of ten per cent of the cost of unused material on hand when the contracts were canceled, whether acquired, supplied, or furnished by the plaintiff or the Government. The costs on which ten per cent profit was payable under the contracts included the cost of material purchased, made, supplied, or acquired for use in the manufacture of the articles specified in the contracts as stated in article 12, and in article 18 of the contracts it was provided that in the case of cancellation the contractor should be paid the ten per cent profit on the cost “ as defined in article 12 of this contract.” Had it been intended that the plaintiff should receive only the ten per cent profit on materials actually consumed in the manufacture of articles up tO' the date of cancellation of the contract, the last-mentioned provision of article 18 would have been unnecessary. This provision seems to me to have been inserted for the purpose of compensating the plaintiff for the sudden termination of the contracts and the cutting off of its profit, which profit, in the main, was computed on the cost of direct labor, and both parties to the contracts must have known and contemplated that labor and superintendence costs could not be terminated by plaintiff as suddenly as the contracts were canceled. In the nature of things, the most profitable part of a cost-plus contract arises toward the end *739 thereof, because there is always a great deal of expensive preparation for the performance thereof on which no profit is payable.
Plaintiff was required to prepare and to proceed to perform very large contracts with the knowledge that every contract might be canceled before a single article was completed and delivered. In case D-845 the contract was made March 30, 1918, and was canceled before a single one of the 100,000 pistols called for, to cost about $1,400,000, had been manufactured, and the plaintiff had never before manufactured pistols. In case D-846 the contract was made January 2, 1918, calling for 440,000 rifles, only 320,000 of which were completed and delivered before cancellation. In case D-847 the contract was made August 22, 1918, and was amended by supplement of September 28, 1918, and called for 50,-000,000 caliber .30 cartridges, and only 1,167,300 cartridges were completed and delivered before cancellation. It was expensive for plaintiff to prepare to perform a large contract. A great amount of planning had to be done; skilled workmen had to be procured and trained; plant space had to be provided, and other work of a similar nature had to be performed. On a great deal of this expense no profit was payable. In entering into these contracts it was proper to make provision for reasonable compensation in the event the contracts were terminated before completion. I think the provisions in these contracts that either the plaintiff or the defendant might purchase the material required to perform the contracts and that in the event of the termination before completion the Government would reimburse the plaintiff for its actual costs and pay as compensation 10 per cent profit on the labor that had been actually employed, and also, as compensation for the cancellation, a ten per cent cent profit on the cost of all material that had been made, acquired, purchased, or supplied by either party, were entirely reasonable. The facts show that the material, upon the cost of which the 10 per cent profit is claimed, was acquired and furnished for use in the manufacture of the articles called for in these contracts and that this material would/ home been used upon the contracts if they had been completely performed. The material in controversy had *740 been, purchased by the plaintiff and the defendant, but while such property was in the custody of the defendant in the so-called Government stores at plaintiff’s plant, the property purchased by plaintiff and the defendant was commingled. When the contracts were terminated, it was impossible to determine which property was purchased by the Government and which by the plaintiff. The books kept by the Government did not show whether the unused material was the material purchased by the plaintiff or by the defendant. It is established however, that the material purchased by one or the other of the parties would have been used upon the contracts, but no profit has been paid thereon.
The cost of the material acquired and furnished by the plaintiff and the Government for the purpose of these contracts and for use in the manufacture of the articles called for therein, and- on hand at plaintiff’s plant when the contracts were canceled, was in case D-845 $140,590.73, 10 per cent of which amounts to $14,059.07; and in case D-846 was $362,529.81,10 per cent of which amounts to $36,252.98; and in case D-847 was $160,824.62, 10 per cent of which amounts to $16,082.46. Unworked material costing $200,000 which was on hand at plaintiff’s plant upon the cancellation of the contracts was turned back to the Government and no profit was or is claimed on such material, inasmuch as the cost thereof had no application to the cost-plus contracts sued upon.
(3) I think contract 14064 involved in case D-844 contemplated and provided for an allowance to plaintiff for depreciation of values of its special plant as distinguished from ordinary depreciation of property due to ordinary wear and tear and accelerated depreciation for overtime use. See art. 12 (f). The remaining contracts in cases D-845, .D-846, and D-847 do not involve this question for reasons that will be hereinafter stated.
Plaintiff claims an allowance of $665,033 on account of 'depreciation in value of its special plant applicable to the «cost-plus contract of July 12, 1917, involved in case D-844.
In 1914 and 1915 plaintiff made certain contracts with the 'British Government for the manufacture of arms and ammunition at fixed prices, which, on the basis of cost of mate *741 rials and labor prevailing at tbat time, would have resulted in a profit to the plaintiff of over $9,000,000. An advance payment under these foreign contracts of 25 per cent was made to the plaintiff within ten days after the execution thereof to enable it to prepare for the performance of such contracts, but these payments were to be deducted from the payments to be made for the articles to be furnished under the contracts and were so deducted. In most, if not all, cases plaintiff gave a bond for the repayment of such advances under the contracts. No part of the cost of plaintiff’s special plant was ever paid for by the British Government, By reason of the great increase in the cost of labor and materials, no profit whatever was made under these foreign contracts and before they were completed they were in part canceled and in part modified to “ cost without profit ” contracts. These foreign contracts terminated before the United States entered the war in April, 1917, and the plaintiff was left with this large and expensive special plant fully equipped for the manufacture of war articles which special plant was of little, if any, market value for commercial purposes and for which plaintiff had no use whatever in connection with its commercial business. When the United States entered the war such plants were in great demand and the plaintiff’s plant had a very substantial market price or value, which market value on July 1, 1917, was, in my view of the evidence, $6,867,325, being the voucher cost less depreciation sustained. The evidence also convinces me that the market value on July 1, 1919, was, at most, $3,039,307, the amount determined by plaintiff, and, in all probability, such fair market value was less than the value so determined by plaintiff. The claimed allowance .for depreciation in value applicable to the contract sued upon is therefore reasonable. The special plant had cost plaintiff in 1914 and 1915, $7,170,-726. It was fully and especially equipped for the immediate manufacture of arms and ammunition, of which the United States Government was ¡much in need. In connection with the construction and equipment of this special plant, plaintiff had expended its surplus and had borrowed about $17,-000,000, on which it was paying 8 per cent interest. If this special plant had been constructed for the manufacture off *742 war articles for the Government after it entered the war, it could not have been completed, equipped, and placed in operation in less time than one and one-half years. Plaintiff, however, actually commenced the manufacture of arms and ammunitions for the defendant at this plant at least a month before any contract was entered into.
Under the rifle contracts with the British Government as they were modified and finally completed, the rifles manufactured and delivered thereunder at cost, without profit, cost England $37 each. This cost did not include any of the cost of the special plant. When the United States entered the war the Government desired to utilize plaintiff’s plant in the manufacture of arms and ammunition. During the negotiations with the General Munitions Board and the Chief of Ordnance, said board acting for and with said Chief of Ordnance, plaintiff proposed to the Government that it take over and operate its plant or that the plaintiff would agree to furnish the desired number of rifles at $38 each, inasmuch as it was then in position to know what the actual cost of the rifles would be, taking into consideration, in fixing the price, the actual outlay by it of cash to provide special plant facilities. The Government, however, desired the cost-plus contract plan. Under the cost-plus contracts for rifles, the rifles completed and delivered thereunder actually cost the defendant $26 each without any allowance for depreciation in values of the special plant or without profit on material acquired and supplied for the purpose of these contracts, but which was not actually used. The entire claim made for special depreciation amounts to about $1.25 a rifle and makes the cost thereof to the Govermnent $27.50 each, or $10.50 less than the fixed price at which the plaintiff proposed to make the rifles for the Government on a flat-price basis.
When contract No. 14064 involved in case D-844 was being negotiated between the plaintiff, the Munitions Board, and the Chief of Ordnance, the plaintiff insisted that some provision be inserted in the contract for reimbursement on account of depreciation in values of this special plant because the termination of the war in which the United States was then engaged would leave the plaintiff with this large and expen *743 sive special plant for which it would have no use and for which there would be little, if any, market. The negotiations leading up to the execution of this contract extended over a period of about three months. This contract, which was executed July 12, 1917, was the first cost-plus contract entered into by the United States after its entry into 'the war in April, 1917. It was finally decided that actual cost as therein defined should be generally as defined in section 302 of the revenue act approved September 8,1916. The defendant insisted on using the provisions of section 302 of the act of September 8, 1916, and the purpose of using this section as the basis of cost under the contract was to make such allowances in determining plaintiff’s costs under the contract as Congress had provided should be made as expense deductions under that act in computing the munition manufacturers’ tax. Subdivision (f) of said section 302 provided for “ a reasonable allowance according to the conditions peculiar to each concern, for amortization of values of buildings and machinery, account being taken of exceptional depredation of special plants.” And, in subdivision (f) of the article 12 of contract 14064 in suit, it was provided that plaintiff’s actual cost for the purpose of the contract should include “ a reasonable allowance, according to the conditions, for depreciation of values of plant and property.” The plaintiff did not at any time ask that a provision be inserted in the contract for an allowance for amortization of its special plant, but only for an allowance for depreciation in values thereof. The plaintiff does not now predicate its claim for the allowance in question upon the theory of amortization. Had amortization of values been provided in the contract instead of depreciation of values, the claim made by plaintiff would be very much larger than it is. It seems to me that had the parties to this contract intended that the plaintiff should receive as a part of its costs only ordinary depreciation of property which occurs regardless of values, they would simply have provided for an allowance for depreciation of property or would have used used the term provided by Congress in the same revenue law in section 12 thereof, i. e.: “A reasonable allowance for the exhaustion, wear and tear *744 of property arising out of its use or employment in the business ” instead of the term a reasonable allowance for the1 depreciation of values of the plant.
The testimony of the chairman of the defendant’s General Munitions Board, the members of which board represented, the defendant and the Chief of Ordnance in the negotiations and in the drafting of the contracts involved in these cases, is that in the preparation of these cost-plus contracts,, particularly the first two of July 12 and July 20, 1917, the first being No. 14064 .involved in case D-844, the officials of plaintiff company contended for a great many things with reference to what should constitute cost; that there was considerable discussion as to what should constitute cost under the contract and some considerable failure to agree on that because, at that time, there were so many unknown quantities to be considered; that the members of the-Munitions Board were in favor of using the definition of cost which Congress had established in the revenue act of 1916 imposing a “munition manufacturers’ tas,” and that when the provision of section 302 of this act “ was brought to my attention, I made the suggestion that that was the cost that I wanted, — the definition of cost that I wanted used, * * * because of the element of policy that was-in mind at the time; * * * anticipating that, to some extent, it would be used as a criterion for things to follow and I thought if we established a cost form to which Congress had already given its approval, it would commend itself, and not be a subject of controversy later * * ■ These facts are not contradicted and they are consistent with all the other evidence. They show, I think, an intent and purpose to provide for the allowance now claimed, which intent and purpose are, in my judgment, supported by the ordinary meaning of the language of article 12 (f) of the contract. No reason is perceived why a more restricted meaning should be given to the expressions in the contracts than they literally impart. This and the other contracts involved were prepared and written by the defendant and any doubt arising from the language used should be construed in favor of the plaintiff.
*745 The first two cost-plus contracts, namely, contract No. 14064 of July 12,1917, involved in case D-844, and contract No. 14067 of July 20, 1917, provided for an allowance for •depreciation of values of plant, and the third cost-plus contract of January 2, 1918, No. 16302, in case D-846, in lieu of providing for an allowance for depreciation of values of the plant provided for a fixed allowance of $75,000 a month for the use and occupancy of the premises and property of the plaintiff devoted to the purposes of this contract. This fixed allowance was to cover, among other things, the «cost of “ general and special depreciation.” The fourth cost-plus contract of March 30, 1918, No. P-7388-1564, case D-845, likewise provided, in lieu of the allowance for depreciation of values of plant, for a fixed allowance of $5,000 a month for the use and occupancy of the premises, property, and equipment devoted to the purposes of this contract, which allowance included, among other things, the cost of “general and special depreciation.”
The last contract, P-14172-2370, of August 22, 1918, case D-847, provided in article 12 (c) (6) for a reasonable allowance for depreciation of values in plant and property. No claim, however, is made for allowance of special depreciation in respect of this contract. Only a small portion of the .articles called for therein was manufactured and on September 28, 1918, the contract was supplemented so that the plaintiff might manufacture the articles under contract No. 14067. This contract was canceled December 12,1918.
From a study of the entire records, I think the plaintiff has established the fair market value of its special plant at July 1, 1917, and July 1, 1919, the difference between the market value on July 1,1917, and such value on July 1,1919, being the amount on which “ depreciation in value ” is ■claimed under the contracts which provided for such allowance. I am satisfied with the method and manner in which the plaintiff has allocated this depreciation in value of its special plant to the various contracts with the defendant, -which method gives credit for the allowances made and paid for ordinary wear and tear.
The evidence contains two distinct computations of plaintiff’s claim in D-844 on account of depreciation in value of *746 the buildings and miscellaneous structures comprising its special plant.
First (reflected in the petition), from the depreciated cost of said special plant as of July 1, 1917, there was deducted the determined market value of such special plant as of July 1, 1919, and it was determined that the difference between said sums represented the depreciation in value which occurred between said dates. The proportion of such depreciation in value allocated to contract 14064 sued upon is based upon the area occupied by the machinery used in the performance of said contract in accordance with a survey made January 1, 1919.
In the second computation the market value of the special plant as of July 1,1917, is taken as the value thereof on that date and the market value of said special plant as of July 1, 1919, is taken as the value thereof on that date, and it was determined that the difference between said sums represented the amount of depreciation in value of the special plant between said dates. In this computation the proportion of said depreciation in value which is allocated to contract 14064, involved in case D-844, equals the proportion of cost of direct labor employed in performing the contract to the cost of all of the direct labor employed in the entire plant. This method is known as the direct-labor method which was agreed upon between the plaintiff and the War Department in the settlement of all other indirect charges under the contract.
In both computations there was deducted the proportional part of the payments therefore made to plaintiffs on account of depreciation due to wear and tear of that portion of the special plant charged against the contract in the computation. By the first determination the balance due plaintiff on account of the depreciation of value of its buildings and miscellaneous structures comprising the special plant is $665,033 and under the second determination the balance due plaintiff on said account is $943,911.
The computation by the plaintiff of the claim for an allowance on account of depreciation in value of the property under article 12 (f) of contract 14064 under each of the two methods adopted is as follows:

*747
First method

Depreciated cost as of July 1, 1917_$6,867, 325
Less market value July 1, 1919 (estimated)_ 3, 039, 307
Equals depreciation in value_ 3, 828, 018
Proportion of said depreciation in value chargeable to all cost-plus contracts (87.4% of $3,828,018) (by plant occupancy method)_ 3,345, 688
Proportion of said depreciation in value chargeable to contract sued upon (25.78% of $3,345,688)_ 862,519
Less depreciation paid_ 257, 943
Balance- 604, 576
Add 10% profit on $604,576 (as per paragraph 14 of contract)_ 60,457
Amount claimed_ 665, 033

Second method

Market value of special plant July 1, 1917_$8, 664, 029
Less market value as of July 1, 1919_ 2,525,233
Equals depreciation in value of said special plant_ 6,138, 796
Proportion of said depreciation in value applicable to cost-plus contracts (64.78% of $6,138,796) (by direct labor method)_ 3,976,712
Proportion of said depreciation of value chargeable to contract sued upon (25.78% of $3,976,712)_ 1,025,196
Less (64.78% of depreciation paid)- 167, 095
Balance- 858,101
Plus profit of 10% of said $858,101 (as per paragraph 14 of contract)_ 85, 810
Amount claimed- 943, 911
The above computations are based upon determinations made by plaintiff for that purpose as follows:
The depreciated cost of the special plant on July 1, 1917, was determined by a detailed computation of those items of cost of the actual construction of said buildings and improvements, which sum was found to be $7,170,726, and deducting therefrom the accrued depreciation as shown by *748 the books of the company from the time of erection, of said buildings and improvements to July 1, 1917, in the amount of $808,401, the balance was determined to be the depreciated cost of said buildings and miscellaneous structures as of July 1, 1917, or $6,867,325.
The market value of the said buildings and miscellaneous structures comprising the special plant was determined on the basis of the sales price of six similar plants situated in similar localities and used for similar purposes, two of which were sold in October, 1917, and the others sold in December, 1918, June, August, and December, 1919, respectively. In making said comparison plaintiff first conducted an investigation to identify suitable comparative plants, the sales of which were actually bona fide, and ascertain the actual sales prices. A physical appraisal was then made of each of said six properties to determine the cost of reproduction new, less depreciation (denominated sound value or replacement value), at date of sale. The ratio of sales price to such “ sound value ” was thus determined for each plant, and the average of such ratio for the two plants sold in 1917 was 124.47 per cent, and the average ratio for the four plants sold between December, 1918, and December, 1919, was 39.93 per cent of such sound value. Plaintiff then made a physical appraisal of its special plant, and by the identical methods used in determining the sound value of the six properties actually sold a determination was made of the sound value of plaintiff’s special plant as of July 1, 1917, and July 1, 1919, and it was found that the cost of reproduction less depreciation of said special plant, as of July 1, 1917, was $6,703,478.79, and that the cost of reproduction less depreciation of said plant as of July 1, 1919, was $8,292,753.91. By the application of the same ratios of market value to sound value as had been determined as a result of the investigation of the six comparative sales, it was determined by plaintiff that the market value of its special plant as of July 1, 1917, was 124.47 per cent of its sound value on that date, or $8,664,-029, and the market value of said special plant as of July 1, 1919, was found to be 39.93 per cent of its sound value on that date, or $2,525,233. The depreciation in value of the *749 said special plant between July 1, 1917, and July 1, 1919, was determined by subtracting its market value on July 1, 1919, from its market value on July 1, 1917, and said depreciation in value was found to be $6,138,796.
In allocating the proper proportion of said depreciation in value of the special plant which was applicable to contract 14064, an actual survey was made of the manufacturing area of said special plant and it was found to be 1,863,285 square feet. An actual survey was also made of the manufacturing area of the entire plant, and it was found to he 2,792,635 square feet. A computation was also made of the floor area occupied in the performance of plaintiff’s “ cost-plus contracts ” with the defendant (including contract 14064) and the other work of plaintiff on the basis of a survey made by it on January 1, 1919, and it was found that on the basis of said survey the said cost-plus contracts occupied an area of 1,648,564 square feet, or 87.40 per cent of the floor area of the entire special plant. In the first method, reflected in the petition, this percentage was applied to the depreciation in value of the special plant, and shows an allowance of $665,033 due under contract- 14064.
By the direct-labor method used by plaintiff and the Government in the settlement of all indirect charges under the contract, a computation was also made of all of the payments made by plaintiff for direct labor employed in the entire plant during 1918, segregated as to contracts, and it was found that, on a basis of a plant area of 2,780,000 square feet, there was occupied by the United States cost-plus contracts, including contract 14064, 1,800,976 square feet, or 64.78 per cent of the entire plant. The percentage thus determined was applied to the depreciation in value of the special plant, and it showed that $3,976,712 of the depreciation in value was applicable to cost-plus contracts.
A computation was made of all payments for direct labor under all cost-plus contracts segregated as to each contract and it was found that all of said payments aggregated $7,497,904, of which $1,993,359, or 25.78 per cent, was paid for direct labor upon contract No. 14064. Applying this percentage of 25.78 per cent to the depreciation in value of *750 said special plant which was applicable to the cost-plus contracts on the first method, reflected in the petition, it is found that the amount of said depreciation in value applicable to contract 14064 was 25.78 per cent of $3,345,088, or $862,519. Applying the same ratio to the depreciation in value of the special plant applicable to the cost-plus contracts according to the direct-labor method, it was found that the amount which should be allocated to contract 14064, on account of depreciation in value of the special plant, was 25.78 per cent of $3,976,712, or $1,025,196.
Certain witnesses for the defendant criticized the plaintiff’s determinations of market value, but, in my judgment, such criticism was overcome on rebuttal.
The methods used in all of the above surveys, appraisals, and computations are consistent and in accordance with the most approved methods and practices in determining values and in making appraisals, and are recognized in the business world.
The amounts found to be due for depreciation in values under the above ¡methods were checked by plaintiff with its records pertaining to other transactions and, also, by the capitalization of the rental value of certain property under a contract between the United States and the plaintiff during the war, and the figures and results arrived at fairly corresponded with.the computation.
On the whole, I am of opinion that plaintiff is entitled to recover and that judgments should be rendered in its favor for $665,033 in case D-844 for depreciation in value of its special plant; for $14,059.07 in case D-845; for $36,252.98 in case D — 846; and for $16,082.46 in case D — 847, for its profit on account of unworked material which was acquired, supplied, and furnished for the purposes of these contracts and for use in the manufacture of the articles called for therein. I think a new trial should be allowed and upon the records .before the court judgments should be entered as above.